# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**PHYLLIS QUINTANA,**

    **Plaintiff,**

    vs.                                                                                              Civ. No. 17-233 KK

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

    **Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 13) filed July 5, 2017, in support of Plaintiff Phyllis Quintana's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title II disability insurance benefits and Title XVI supplemental security income benefits. On September 8, 2017, Plaintiff filed her Motion to Reverse and Remand For A Rehearing With Supporting Memorandum ("Motion"). (Doc. 18.) The Commissioner filed a Response in opposition on November 1, 2017 (Doc. 20), and Plaintiff filed a Reply on November 21, 2017. (Doc. 21.) The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is not well taken and is **DENIED.**

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case. (Doc. 26.)

## I. Background and Procedural Record

Claimant Phyllis Quintana ("Ms. Quintana") alleges that she became disabled on September 1, 2012, at the age of thirty-two because of arthritis in both knees, back problems, depression, posttraumatic stress syndrome ("PTSD"), and anxiety. (Tr. 255, 259.[2]) Ms. Quintana completed the tenth grade in 1995, and has worked as a fast food restaurant assistant manager, retail store cashier, and food store cashier. (Tr. 260, 265-72.) Ms. Quintana reported she stopped working on September 1, 2012, due to her medical conditions. (Tr. 259.)

On August 13, 2013, Ms. Quintana filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq*. (Tr. 230-33.) She also filed an application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq. (Tr. 234-39.) Ms. Quintana's applications were initially denied on January 7, 2014, and January 28, 2014. (Tr. 96-110, 111, 112-26, 153-55, 156-59.) They were denied again at reconsideration on July 2, 2014. (Tr. 127, 128-39, 141-52, 166-68, 170-73.) On August 22, 2014, Ms. Quintana requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 174-75.) The ALJ conducted a hearing on November 13, 2015. (Tr. 55-95.) Ms. Quintana appeared in person at the hearing with attorney representative Michael Armstrong. (*Id*.) The ALJ took testimony from Ms. Quintana (Tr. 61-89), and an impartial vocational expert ("VE"), Cassandra Humphress (Tr. 89-94). On January 8, 2016, ALJ John W. Rolph issued an unfavorable decision. (Tr. 28-48.) On December 13, 2016, the Appeals Council issued its decision denying Ms. Quintana's request for review and upholding the ALJ's final decision. (Tr. 1-4.) On February 15, 2017, Ms. Quintana timely filed a Complaint seeking judicial review of the Commissioner's final decision. (Doc. 1.)

---

[2] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 13) that was lodged with the Court on July 5, 2017.

## II. Applicable Law

### A. Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals). The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

(1) At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[3] If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.

(2) At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.

(3) At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

(4) If, however, the claimant's impairments do not meet or equal in severity one of the listing described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform her "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's

---

[3] Substantial work activity is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). Work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before. *Id.* Gainful work activity is work activity that you do for pay or profit. 20 C.F.R. §§ 404.1572(b), 416.972(b).

> residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.
>
> (5) If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n. 5, 96 L.Ed.2d 119 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

### B. Standard of Review

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias,* 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d

1270, 1272 (10th Cir. 2008). A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

### III. Analysis

The ALJ made his decision that Ms. Quintana was not disabled at step five of the sequential evaluation. (Tr. 47-48.) Specifically, the ALJ determined that Ms. Quintana met the insured status requirements of the Social Security Act through March 31, 2013, and that Ms. Quintana had not engaged in substantial gainful activity since September 1, 2012. (Tr. 33.) He found that Ms. Quintana had the following severe impairments: opioid dependence (on Suboxone Replacement Therapy), morbid obesity, bilateral knee impairment with pain, lumbar spine impairment with pain and radiculopathy, right leg pain status-post deep vein thrombosis (DVT), chronic pain syndrome, PTSD, depression NOS/dysthymia, and anxiety disorder (NOS). (Tr. 34.) The ALJ also determined that Ms. Quintana had nonsevere impairments of a history of polysubstance abuse (methamphetamine and marijuana), tobacco abuse, shortness of breath, nausea, fatigue and sleep apnea, heel pain, cellulitis of the face, mild degenerative changes of the

5

hips, allergies and allergic rhinitis, status-post ventral hernia repair/umbilical hernia repair, pruritic dermatitis, cervical pain, dental disease, vaginal bleeding, constipation and hematochezia, benign headache, and hemorrhoids. (Tr. 35-36.) The ALJ, however, determined that Ms. Quintana's impairments did not meet or equal in severity one of the listings described in Appendix 1 of the regulations. (Tr. 36-38.) As a result, the ALJ proceeded to step four and found that Ms. Quintana had the residual functional capacity

> to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), which is that she is able to lift, carry, push, and pull up to 20 pounds occasionally and up to 10 pounds frequently. However, the claimant can stand and walk a combined total of four hours in an eight-hour day, for 45 to 60 minutes at a time. She can sit for six hours in an eight-hour day, for 60-90 minutes at a time. The claimant can frequently balance, and can occasionally stoop, kneel, and crouch. She can occasionally climb ramps and stairs, but can never climb ladders, ropes or scaffolds. Furthermore, she can never crawl. The claimant must avoid more than occasional exposure to extreme cold, vibration, and exposure to irritants such as fumes, odors, dust, gases, chemicals, and poorly ventilated spaces. The claimant should avoid all exposure to hazards such as dangerous machinery and unsecured heights. The claimant is fully capable of learning, remembering, and performing simple, routine and repetitive work tasks, involving simple work instructions, which are performed in a routine, predictable, and low stress work environment. This type of environment ("low stress") is defined as one in which there is a regular pace, few workplace changes, and no "over the shoulder" supervision. Finally, the claimant can attend and concentrate for two hours at a time with normal breaks.

(Tr. 38.) The ALJ then determined at step five that considering Ms. Quintana's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the claimant could perform. (Tr. 47-48.)

In support of her Motion, Ms. Quintana argues that (1) the ALJ failed to give adequate reasons for rejecting the opinion of treating provider Silaja Cheruvu, M.D.; and (2) that the ALJ failed to resolve the conflict between the DOT and VE testimony in violation of SSR 00-4p. (Doc. 18 at 14-21.) For the reasons discussed below, the Court finds there is no reversible error.

A.   **Relevant Treatment Notes**

1.   **Will Kaufman, M.D.**

On September 19, 2014, Ms. Quintana presented to First Choice Community Health South Valley Health Commons and saw Dr. Will Kaufman, M.D. (Tr. 682.) The purpose of her visit was to "establish Suboxone program."[4] (Tr. 683.)

2.   **NP Karen Farias**

On October 14, 2014, Nurse Practitioner Karen Farias enrolled Ms. Quintana in the Suboxone program and took a history of her present illness. (Tr. 679-81.) NP Farias noted that Ms. Quintana had been on Suboxone for the past three years through UNM Focus and was transitioning her care to First Choice. (Tr. 679.) Ms. Quintana reported a history of right lower extremity deep vein thrombosis; neck pain, mostly right side, and associated with bilateral temple headaches; bilateral knee pain that is "mostly controlled with Suboxone"; right back and radicular pain that was helped with Gabapentin; and sleep apnea.[5] (*Id.*) On physical exam, NP Farias noted in pertinent part that Ms. Quintana ambulated without a limp and used no assistive devices, but was unable to sit for prolonged periods of time without having to get up and walk around the room. (Tr. 680.) NP Farias further noted that Ms. Quintana was pleasant, cooperative, appropriate, and mildly anxious. (*Id.*) NP Farias planned to refer Ms. Quintana to Dr. Cheruvu for transfer of her Suboxone replacement treatment. (*Id.*) NP Farias instructed

---

[4] Suboxone is used to treat narcotic opiate addiction. *See* https://www.drugs.com/suboxone.html.

[5] Ms. Quintana reported that she had a CPAP machine, but no mask or tubing. (Tr. 679.) She stated that she had stopped using the machine because it kept falling off her face, her nose was stuffy, and it was hard to breath. (*Id.*) She reported being willing to try equipment again. (*Id.*)

7

Ms. Quintana to continue with her current medications for anxiety and musculoskeletal pain,[6] and to resume using her CPAP nightly. (Tr. 680-81.)

On October 27, 2014, Ms. Quintana saw NP Farias for follow up. (Tr. 669-70.) Ms. Quintana reported some increased anxiety related to her mother being ill. (Tr. 669.) Ms. Quintana also reported, *inter alia*, that she was still having trouble sleeping, but that the Flexeril helped her back "a lot." (*Id.*)

On November 11, 2014, Ms. Quintana saw NP Farias for follow up. (Tr. 675.) Ms. Quintana reported worsening pain in her knees and back due to cold weather. (*Id.*) On physical exam, NP Farias noted that Ms. Quintana ambulated without an assistive device and had no obvious weakness or limp, but did appear uncomfortable. (*Id.*) NP Farias further noted that Ms. Quintana was pleasant, cooperative, and appropriate. (*Id.*) NP Farias increased the Gabapentin dose for anxiety, and noted that Ms. Quintana wanted a referral for an exercise program at First Choice Community Healthcare for her pain and weight loss. (*Id.*)

    3.    **Silaja Cheruvu, M.D.**

On October 30, 2014, Ms. Quintana saw Silaja Cheruvu, M.D., for an initial FCCH Opiate Dependence exam. (Tr. 676-78.) Dr. Cheruvu noted that Ms. Quintana presented seeking treatment for opiate dependence. (Tr. 676.) Dr. Cheruvu also noted a history of anxiety and depression. (*Id.*)

Ms. Quintana saw Dr. Cheruvu again on December 10, 2014, February 22, 2015, March 11, 2015, June 9, 2015, July 9, 2015, August 13, 2015, and September 15, 2015. (Tr. 632-35, 639-45, 646, 650-53, 654-61, 662-68, 671-74.) At each of these visits, Dr. Cheruvu noted that Ms. Quintana presented for continued Suboxone opiate replacement therapy. (*Id.*)

---

[6] Ms. Quintana was prescribed Fluoxetine, Hydroxyzine, Trazodone and Gabapentin for anxiety and right lumbosacral radiculopathy, and Flexeril for cervical pain. (Tr. 680.)

Dr. Cheruvu's physical exams noted only Ms. Quintana's vital signs and measurements from flowsheet; *i.e.,* height, weight, body surface area and body mass index. (*Id.*) Dr. Cheruvu also noted at each visit that Ms. Quintana was alert and oriented, and in no acute distress. (*Id.*) Dr. Cheruvu's diagnosis for each visit, without more, was "opioid dependence, on replacement therapy." (*Id.*)

On October 15, 2015, Dr. Cheruvu signed two completed assessment forms on Ms. Quintana's behalf - a *Medical Assessment of Ability To Do Work Related Activities (Physical)* and a *Medical Assessment of Ability To Do Work Related Activities (Mental).* (Tr. 775, 776.) Both forms instructed the health care provider completing the form to "[p]lease consider patient's medical history and the chronicity of findings as from 2013 to current examination." (Tr. 775, 776.) As to Ms. Quintana's physical limitations, Dr. Cheruvu indicated that Ms. Quintana could not maintain effort for long periods without a need to decrease activity or pace, or to rest intermittently because of pain, fatigue, and dizziness. (Tr. 775.) She assessed that Ms. Quintana could both occasionally and frequently lift and/or carry less than 10 pounds, stand and/or walk less than 2 hours in an 8-hour day, and sit less than four hours in an 8-hour day. (*Id.*) Dr. Cheruvu explained that on account of blood clots and issues with her knee and feet "no circulation is an issue," and thus "[s]itting and walking for more than 2 hours is not possible." (*Id.*) Dr. Cheruvu noted Ms. Quintana suffers "siadica [sic] in lower back witch [sic] causes pain and muscil [sic] tension." (*Id.*) Dr. Cheruvu also assessed that Ms. Quintana was limited in her ability to push and/or pull in upper extremities, and that she should never kneel, stoop or crawl, and only occasionally crouch. (*Id.*)

As to Ms. Quintana's mental limitations, Dr. Cheruvu noted that the form was "[c]ompleted by patient w/my help." (Tr. 776.) She indicated therein that Ms. Quintana suffers

9

from a pain producing impairment, injury or sickness; her pain is severe; she suffers from fatigue as a result of her impairments; and she has to rest or lie down at regular intervals because of her pain and/or fatigue. (Tr. 776.) Dr. Cheruvu assessed that Ms. Quintana was *slightly limited* in her ability to maintain regular attendance and be punctual within customary tolerance; and *moderately limited* in her ability to (1) maintain attention and concentration for extended periods (*i.e.*, 2-hour segments), (2) perform activities within a schedule, (3) maintain physical effort for long periods without a need to decrease activity or pace, or to rest intermittently (*i.e.,* 2-hour segments), (4) sustain an ordinary routine without special supervision, (5) work in coordination with/or proximity to others without being distracted by them, and (6) make simple work-related decisions. (*Id.*) Dr. Cheruvu assessed that Ms. Quintana was *markedly limited* in her ability to complete a normal workday and workweek without interruptions from pain or fatigue based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods. (*Id.*) Dr. Cheruvu explained that Ms. Quintana "[h]as severe depression which is diagnosed as PTSD also from past issues. Anxiety every day. Sleep disorder is moderate, uses CPAP – 3 liter oxygen at night. Substance Suboxone treatment." (*Id.*)

**B.     The ALJ's Rejection of Dr. Cheruvu's Assessments Is Supported by Substantial Evidence and Properly Based on Contradictory Evidence**

The ALJ accorded Dr. Cheruvu's opinion little weight. (Tr. 45.) He explained that the assessment forms appeared to be completed by Ms. Quintana and only signed off by Dr. Cheruvu. (*Id.*) He also explained that Dr. Cheruvu's opinion was not consistent with the medical evidence of record. (*Id.*) Ms. Quintana argues that the ALJ failed to provide legitimate reasons for rejecting Dr. Cheruvu's opinion as a treating physician. (Doc. 18 at 14-17.) Specifically, Ms. Quintana argues that the ALJ's claim that the assessment forms were completed by Ms. Quintana and merely signed off by Dr. Cheruvu is speculation. (*Id.* at 16.)

10

She asserts that the ALJ should have, at the very least, recontacted Dr. Cheruvu for clarification. (*Id.* at 16-17.) Ms. Quintana further argues that the ALJ failed to explain or identify which parts of the record were inconsistent with Dr. Cheruvu's opinion. (*Id.* at 17.) The Commissioner contends that the ALJ gave two valid reasons for rejecting Dr. Cheruvu's opinion and that the preceding pages of the ALJ's decision noted contradictory findings by both the State agency nonexamining and examining consultants, to which the ALJ accorded great weight. (Doc. 20 at 8-13.) The Commissioner further contends that the ALJ reasonably interpreted the handwritten note initialed by Dr. Cheruvu on the assessment form and was in the best position to resolve any conflicts in the evidence. (*Id.*)

When properly rejecting a treating physician's opinion, an ALJ must follow two steps. *Langley*, 373 F.3d at 1119. First, the ALJ must first determine whether the opinion qualifies for "controlling weight." *Id.* To do so, the ALJ must consider whether the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques." *Id.* If the answer is "no," the inquiry ends. *Id.* If the opinion is well supported, the ALJ must then determine if it is consistent with other substantial evidence in the record. *Id.* If the opinion is deficient in either of these respects, the opinion is not entitled to controlling weight. *Id.* However, even if a treating physician's opinion is not entitled to controlling weight, it is still entitled to deference and must be weighed using the relevant regulatory factors. *Id.*

Here, the ALJ failed to provide a proper analysis under the treating physician rule, and this is error. *Langley*, 373 F.3d at 1119. However, the ALJ's error is harmless because his decision is sufficiently clear for the Court to determine why he chose not to give Dr. Cheruvu's opinion controlling weight. *See Andersen v. Astrue*, 319 F. App'x 712, 721 (10th Cir. 2009) (explaining that the court was not troubled by the ALJ's lack of explicit findings where the

11

alleged limitations were contrary to objective findings and other evidence in the record); *Mays v. Colvin*, 739 F.3d 569, 575 (10th Cir. 2014 (finding no reversible error where the court could tell from the ALJ's decision that the ALJ declined to give controlling weight to treating physician). Moreover, as discussed below, the ALJ's explanation for according little weight to Dr. Cheruvu's opinion is well-supported by other portions of the ALJ's determination and the evidence of record. *See Mounts v. Astrue*, 479 F. App'x 860, 866-67 (10th Cir. 2012) (quoting *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (holding that it is not necessary for the ALJ to address each regulatory factor expressly or at length provided that the ALJ offers good reasons in his opinion for the weight he accorded to a medical opinion).

The ALJ's explanation that Dr. Cheruvu's opinion was not consistent with the medical evidence of record is supported by substantial evidence. Although Ms. Quintana contends that the ALJ failed to indicate which part of the record he was referring to in his explanation, the Court notes that the ALJ's determination immediately preceding his evaluation of Dr. Cheruvu's opinion detailed Ms. Quintana's medical history related to her physical and mental impairments.[7] (Tr. 40-44.) As to Ms. Quintana's alleged physical impairments, the ALJ discussed objective radiologic studies that demonstrated only mild degenerative joint disease in Ms. Quintana's knees bilaterally, mild degenerative disease in her lumbar spine with L5 transitional changes and mild scoliosis, and a normal thoracic spine. (Tr. 41, 42.) The record supports these findings. (Tr. 360, 419, 425.) The ALJ discussed various physical exam findings that demonstrated a normal gait, a full range of motion in her knees, normal strength in her lower and upper extremities, that Ms. Quintana was able to ambulate without assistance, and that Ms. Quintana reported her knee pain was controlled with Suboxone and that her back pain improved with

---

[7] The Court also notes that Ms. Quintana does not point to any evidence that supports Dr. Cheruvu's assessments.

Flexeril.[8] (Tr. 41-43.) The records supports these findings. (Tr. 354, 355, 416, 436, 465, 669, 679, 680.) The ALJ also discussed that Ms. Quintana reported having lost thirty pounds in 2012-2013 by doing stretches and exercising, and on more than one occasion expressed interest in Zumba classes and starting an exercise program for pain and weight loss. (Tr. 41-44.) The record supports these findings. (Tr. 354, 445, 447, 453, 675.) The ALJ discussed Ms. Quintana's reported activities of daily living that included caring for her children, shopping several times a month for several hours at a time, paying bills, reading, watching television, going out of the house daily, walking, spending time with her family, attending doctor appointments, attending church and GED classes, and preparing meals.[9] (Tr. 41-44.) The record supports these findings. (Tr. 276-79, 354, 367.) Finally, the ALJ discussed the other medical source opinion evidence related to Ms. Quintana's alleged physical impairments, none of which supports the degree of Dr. Cheruvu's assessed limitations related to Ms. Quintana's ability to do work related physical activities.[10] (Tr. 41-42, 46.)

---

[8] The ALJ also discussed physical exam findings of noted tenderness in Ms. Quintana's cervical/thoracic spine, her knees popping when squatting, difficulty with the "toe and heel walks" likely due to her weight, and moderate right leg edema associated with DVT. (Tr. 41-43.)

[9] The ALJ discussed that Ms. Quintana testified at the Administrative Hearing that she was no longer able to perform her activities of daily living as previously report, and that her mother helped out with her children, drove her to appointments, and performed the claimant's cooking, cleaning, and laundry. (Tr. 39.)

[10] The ALJ discussed State agency examining medical consultant Sylvia Ramos, M.D.'s opinion. (Tr. 41.) Dr. Ramos's October 1, 2013, exam findings were essentially normal and she found that Ms. Quintana could sit, stand, walk, lift, carry, handle small objects, hear, speak, and travel "except as limited by pain and obesity." (*Id.*, Tr. 356.) The ALJ accorded her opinion great weight and explained that it "does not specify the functional limitations of the claimant, instead subjectively limiting her based upon her pain level and her obesity. . . . Yet, looking at Dr. Ramos' examination in addition to the rest of the medical evidence of record, I have limited the claimant to less than light exertional level." (Tr. 41.)

The ALJ also discussed State agency nonexamining medical consultant opinion evidence. (Tr. 46.) The ALJ accorded Ronald Davis, M.D.,'s and Lawrence Kuo, M.D.'s assessments great weight explaining they were consistent with the evidence of record. (*Id.*) They each assessed that Ms. Ramos was capable of less than light exertional work; *i.e.,* light work with certain postural limitations. (Tr. 104-06, 120-22, 148-49.) The ALJ tempered their findings with additional postural and environmental limitations based on evidence at the hearing level. (Tr. 46.) *See Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (finding that an ALJ does not commit reversible error by electing to temper findings for the claimant's benefit).

As to Ms. Quintana's alleged mental impairments, the ALJ made step two findings, which Ms. Quintana has not disputed, that Ms. Quintana had mild restrictions in her activities of daily living, mild difficulties in her social functioning, and moderate difficulties in concentration, persistence or pace. (Tr. 37.) The ALJ then discussed at step four that Ms. Quintana's mental status exams demonstrated she was oriented, attentive, neat, clean, her memory was good, her judgment and insight were fair, her intelligence average, and that she had no abnormalities with language process, thought process, cognitive functioning or memory.[11] (Tr. 40-43.) The record supports these findings. (Tr. 337-38, 354, 366-67, 796.) The ALJ discussed that Ms. Quintana reported she was able to read for "about an hour" and had no problems following a television program. (Tr. 42.) The record supports these findings. (Tr. 367.) The ALJ also discussed the other medical source opinion evidence related to Ms. Quintana's alleged mental impairments, none of which supports the degree of Dr. Cheruvu's assessed limitations related to Ms. Quintana's ability to do work related mental activities.[12]

---

[11] The ALJ also discussed mental status exam findings that demonstrated Ms. Quintana's concentration was poor, some minor difficulties with memory, and that one mental healthcare provider assessed a GAF score of 40. (Tr. 410, 41.) The ALJ gave little weight to the GAF score (Tr.40), and Ms. Quintana has not disputed this finding.

[12] The ALJ discussed State agency examining psychological consultant Amy DeBernardi, Psy.D.'s evaluation and assessment of Ms. Quintana. (Tr. 41-42.) The ALJ noted that Dr. DeBernardi found Ms. Quintana "to have the clear ability to reason and understand, as her remote and recent memories were generally intact and her immediate memory was fair. . . . The claimant's sustained concentration and persistence were also fair, although the claimant's adaptive skills and ability to tolerate stress were relatively limited." (Tr. 42.) Dr. DeBernardi assessed that because Ms. Quintana presented with some symptoms of depression and anxiety, these issues might make it difficult for Ms. Quintana to be a dependable employee. (*Id.*, Tr. 368.) The ALJ accorded Dr. DeBernardi's opinion great weight because "she performed a thorough examination," and because her assessment was consistent with her examination findings and with the remainder of the evidence of record. (Tr. 42.)

The ALJ also discussed State agency nonexamining psychological consultant opinion evidence. (Tr. 46.) The ALJ accorded great weight to Jon Etienne Mourot, Ph.D.'s and Cathy Simutis, Ph.D.'s assessments because they were consistent with the evidence of record. (*Id.*) Dr. Mourot and Simutis each assessed that Ms. Quintana retained the capacity to do detailed but not complex tasks, involving 3-4 steps with several variables; *i.e.,* semiskilled. (Tr. 107, 123, 136, 149.) The ALJ tempered their findings by limiting Ms. Quintana to unskilled work. (Tr. 46.) *See Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (finding that an ALJ does not commit reversible error by electing to temper findings for the claimant's benefit).

The ALJ's discussion of the medical evidence record, therefore, demonstrates that Dr. Cheruvu's assessments related to Ms. Quintana's ability to do work-related physical and mental activities were not consistent with the medical evidence record.

The ALJ rejected Dr. Cheruvu's assessments on the basis of contradictory medical evidence. Therefore, even if the ALJ improperly speculated that Dr. Cheruvu's assessments appeared to have been completed by the claimant and only signed off by Dr. Cheruvu, to do so was harmless in light of the medical record evidence.[13] *See Allen v. Barnhart*, 357 F.3d 1140, 1156 (10th Cir. 2004) (a determination of harmless error may be appropriate "where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way"). Additionally, the ALJ was under no obligation to recontact Dr. Cheruvu for clarification. Under the regulations, an ALJ *may* recontact a treating/medical source, *inter alia*, if after weighing all the evidence he cannot reach a conclusion about whether a claimant is disabled. 20 C.F.R. §§ 404.1520b(c)(1) and 416.920b(c)(1). Here, the ALJ was able to determine that Ms. Quintana was not disabled based on contradictory medical evidence.

Lastly, the Court's review of the record demonstrates that Dr. Cheruvu's relationship with Ms. Quintana was for Suboxone replacement therapy, and that Dr. Cheruvu's treatment notes reflected physical exams that were limited to vital signs and flowsheet measurements.

---

The record also contains several forms completed by Minda Brown Jaramillo, LCSW, related to Ms. Quintana's mental impairments. (Tr. 778-79, 780, 781, 788.) The ALJ accorded *no weight* to LCSW Jaramillo's assessments. (Tr. 45.) The record also contains a form prepared by James Libertoff, LCSW, that indicated Ms. Quintana meets certain of the Part A and Part B criteria for Listing 12.06 – *Anxiety-Related Disorders*. (Tr. 786.) The ALJ accorded *some weight* to LCSW Libertoff's assessment to the extent his limitations translated to a limitation to unskilled work. (Tr. 45.) Ms. Quintana did not dispute the ALJ's findings related to these other medical source opinions. *See* SSR 06-03p, 2006 WL 2329939, at *2 (describing other medical sources are nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapist).

[13] "An ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)).

(Tr. 634, 641, 652, 656, 664, 673.) Further, Dr. Cheruvu's contemporaneous evaluation of Ms. Quintana's mental status consistently indicated "[a]lert and oriented. No acute distress." (*Id.*) *See* 20 C.F.R. §§ 404.1527(c)(2)(ii) and 416.927(c)(2)(ii) (explaining that the ALJ looks at the treatment the source provided and at the kinds and extent of examinations and testing the source performed when weighing medical source evidence); *see also* 20 C.F.R. §§ 404.1527(c)(3) and 416.927(c)(3) (explaining that the more a medical source presents relevant evidence to support their opinion, particularly medical signs and laboratory findings, the more weight will be given to their opinion). Thus, the limited nature and extent of Dr. Cheruvu's treatment relationship with Ms. Quintana, along with her limited treatment notes, further support the ALJ's determination to accord little weight to Dr. Cheruvu's functional assessments related to Ms. Quintana ability to work related physical and mental activities.

### C. The Commissioner Met Her Burden At Step Five

Ms. Quintana generally argues that the ALJ failed to resolve a conflict between the DOT and the VE testimony related to her standing/walking limitations. (Doc. 18 at 18-21.) Specifically, Ms. Quintana contends that because the ALJ's hypothetical limited Ms. Quintana to a combined total of four hours of standing and/or walking in an 8-hour workday, that the ALJ was required to elicit specific testimony regarding the conflict between the light exertional jobs the VE identified and the DOT because a full range of light work requires walking for up to six hours in an eight-hour workday. (*Id.*) Ms. Quintana also contends that the ALJ was required to elicit specific VE testimony regarding the conflict between the sedentary exertional jobs the VE identified and the DOT because the ALJ's hypothetical requires Ms. Quintana to change positions a minimum of once every hour thereby effectively limiting her to standing and/or walking for four hours and sitting for four hours, and further requires that she must be able to sit

and stand at will. (*Id.*) The Commissioner asserts that the ALJ reasonably relied on VE testimony at step five. (Doc. 20 at 13-18.)

The Commissioner's step five showing that the claimant can perform other work existing in the national economy must be supported by substantial evidence. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993). Before relying on expert testimony as substantial evidence to support a determination of nondisability, "an ALJ must investigate and elicit a reasonable explanation for any conflict between the [DOT] and expert testimony" *Haddock v. Apfel*, 196 F.3d 1084, 1091 (10th Cir. 1999). Social Security Ruling 00-4p further clarifies the ALJ's affirmative responsibility to ask about conflicts as follows:

> [w]hen vocational evidence provided by a VE or VS is not consistent with information in the DOT, the [ALJ] must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The [ALJ] will explain in the determination or decision how he or she resolved the conflict. The [ALJ] must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00-4p, 2000 WL 1898704, at *4.

The Tenth Circuit has held in unpublished cases that because the DOT does not discuss the availability of a sit/stand option, a VE's testimony about the availability of jobs with a sit/stand option does not raise an apparent conflict with the DOT. *See Wahpakeche v. Colvin*, 640 F. App'x 781, 785-86 (10th Cir. 2016) (unpublished) (holding that "DOT's silence concerning stand/sit options" for a specific job does not constitute a conflict with a VE's testimony that a claimant needs stand/sit options to perform that job); *see also Newburn v. Barnhart*, 62 F. App'x 300, 304 (10th Cir. 2003) (unpublished) (holding there was no unresolved discrepancy between the VE's testimony and the DOT where the ALJ directly addressed the issue of whether the designated jobs could be performed with the specified limitations on hours of standing or walking).

Here, the ALJ limited Ms. Quintana to a combined total of four hours of standing and/or walking in an eight-hour workday. (Tr. 38.) This limitation, on its face, reduced Ms. Quintana's ability to do a full range of light work, thereby precluding the light exertional jobs the VE identified absent specific resolution of the apparent conflict.[14] However, the Court need not address whether the ALJ failed to resolve that conflict because the ALJ identified three sedentary jobs Ms. Quintana could perform for which there was no apparent conflict to resolve.[15] The ALJ, therefore, met his burden at step five by showing that Ms. Quintana can perform other work that exists in the national economy

The ALJ's RFC did not restrict Ms. Quintana to sitting and standing/walking for a total of *4 hours each* in an 8-hour workday. Here, the ALJ determined that Ms. Quintana "can stand and walk a combined total of four hours in an eight-hour day, for 45 to 60 minutes at a time. She can sit for six hours in an eight-hour day for 60-90 minutes at a time." (Tr. 38.) In other words, Ms. Quintana can sit for a total of six hours over the course of the day, but cannot sit at any one time for longer than one and a half hours. Additionally, she can stand/walk for a total of four hours in an eight hour workday, if necessary, but cannot stand/walk at any one time for longer than one hour. These limitations fall within the exertional standing/walking and sitting requirements of sedentary work. SSR 83-10, 1983 WL 31251, at *5-6; *see also* 20 C.F.R. §§ 404.1567(a), 416.967(a). Further, the hearing testimony makes clear that the ALJ was *not* effectively restricting Ms. Quintana to standing/walking and sitting for a total of *4 hours each* in an 8-hour workday, and the ALJ related with precision to the VE Ms. Quintana's limitations with

---

[14] "[A] job is in this [light] category when it requires a good deal of walking or standing[.] . . . [T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5-6; *see also* 20 C.F.R. §§ 404.1567(b), 416.967(b).

[15] Sedentary work requires that "periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5-6; *see also* 20 C.F.R. §§ 404.1567(a), 416.967(a).

18

respect to standing/walking and sitting, as she was required to do. (Tr. 91.) *See Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991) (testimony elicited by hypothetical questions must relate with precision all of claimant's impairments to constitute substantial evidence). Ms. Quintana's argument that the ALJ's RFC precludes sedentary exertional jobs, therefore, necessarily fails.

Additionally, the ALJ defined how often Ms. Quintana needed to change positions. The purpose of incorporating an individual's need to alternate between sitting and standing in the RFC assessment is to address symptoms, including pain, that may have an impact on an occupation's strength demands. SSR 96-8p, 1996 WL 374184, at *6. SSR 83-12 states in pertinent part that

> [i]n some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)
>
> There are some jobs in the national economy – typically professional and managerial ones – in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a VS [vocational specialist] should be consulted to clarify the implications for the occupational base.

SSR 83-12, 1983 WL 31253, at *4. SSR 96-9p instructs that the extent of the erosion to the occupational base would depend on the facts in the case record, and that the RFC assessment

must be specific as to the frequency of the individual's need to alternate sitting and standing. SSR 96-9p, 1996 WL 374185, at *7; *see also Vail v. Barnhart*, 84 F. App'x 1, 5 (10th Cir. 2003) (unpublished) (holding that an ALJ's failure to define how often a claimant would need to change positions was a critical omission). In compliance with these rulings and case law, the ALJ precisely defined how often Ms. Quintana would need to change positions, and consulted a VE who testified there were certain sedentary jobs available in the national economy that would accommodate Ms. Quintana's limitations with respect to standing/walking and sitting in an eight hour workday as described in his hypothetical. SSR 96-9, 1996 WL 374185, at *7 (explaining that it may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work). The ALJ met his burden at step five and there is no reversible error as to this issue.

## IV. Conclusion

For the reasons stated above, Ms. Quintana's Motion to Reverse and Remand for a Rehearing With Supporting Memorandum (Doc. 18) is **DENIED.**

_____
**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**